GEORGE E. DOVEY ET AL., APPELLANTS, V. OLIVER C. DOVEY ET AL., APPELLEES.

FILED APRIL 3, 1914. No. 17,694.

1. **Partnership:** SETTLEMENT: SUIT TO RESCIND: BURDEN OF PROOF. In an action to rescind a settlement of the affairs of a partnership and recover the consideration paid to a retiring partner on account of duress and fraud, the burden of proof is on the plaintiff to show, not only duress and fraud in obtaining the settlement, but that the consideration paid to the retiring partner is inequitable, excessive and unjust.

2. ———: ———. In the absence of any special agreement between the partners upon the subject, the rule of law is that the partners are to share equally in both profits and losses; and the mere fact that the partners have put an unequal amount of capital into the common stock, or that one has put in all the capital and the others only their skill and industry, will make no difference in the rule.

3. ———: DEATH OF PARTNER: RIGHTS OF REPRESENTATIVES. "As a general rule, where a surviving partner continues to use the capital of a deceased partner in the business, the representatives of the latter, in the absence of any agreement to the contrary, have the election to demand either interest on the capital used or the profits earned by its use, the latter being accretions to the fund owned by them. There is, however, no inflexible rule governing all cases, but each case depends upon its own circumstances and equities." *Robinson v. Simmons*, 146 Mass. 167.

4. ———: SETTLEMENT: RIGHT TO RESCISSION. Where plaintiffs have failed to rescind or seek a rescission of a partnership settlement, and have neglected and refused to surrender or offer to surrender any part of the consideration which they have received for the settlement, they cannot require a court of equity to set aside the settlement of which they complain.

5. **Appeal:** AFFIRMANCE: EQUITY. Where the supreme court, after a careful examination of the record in a suit of equity, and a consideration of the same without regard to the judgment of the district court, is unable to say that the judgment of that court is wrong, it will ordinarily be affirmed.

APPEAL from the district court for Douglas county: ALEXANDER C. TROUP, JUDGE. *Affirmed.*

*John L. Webster*, for appellants.

*John J. Sullivan* and *Francis A. Brogan*, contra.

BARNES, J.

This is an action to recover $7,500 in money paid to the defendant Oliver C. Dovey, and for the return and cancelation of certain notes, and a mortgage given to secure the same, delivered to him, on the ground that they were obtained by duress. The issues were made up, and a trial to the district court for Douglas county resulted in a judg-

ment for the defendant, and the plaintiffs have brought the case to this court by an appeal.

The evidence discloses that George E. Dovey and his father, E. G. Dovey, as equal partners, entered into a co-partnership in 1876, under the firm name of E. G. Dovey & Son, at Plattsmouth, Nebraska, and the partnership continued until the death of E. G. Dovey on February 1, 1881. It is conceded that at that time the net value of the partnership assets was $52,092.42, one-half of which belonged to the plaintiff, George E. Dovey, to wit, $26,046.21. In 1881 E. G. Dovey died intestate, leaving three sons, George E., Horatio N., and Oliver C. Dovey, and his widow, Mrs. C. Dovey. Each of the sons and the widow then became the owner of an undivided one-fourth in the one-half interest in the business which had belonged to E. G. Dovey, amounting to $6,511.55 each; George owning the other half interest in addition thereto. These facts are undisputed. It was alleged in the petition that after the death of E. G. Dovey the business was carried on under the same name as before, until September 22, 1909, when Oliver withdrew from the firm, and that at that time the total net assets amounted to $142,796.56; that during this whole period none of the parties placed any additional money or property in the business, and that no division of profits nor dividends were declared. The amount withdrawn by each was then set forth. It was then alleged that, when Oliver desired to withdraw, the parties were unable to agree; that Oliver employed counsel, and insisted upon the employment of an accountant to examine the books. On recommendation of Oliver and his attorney, an accountant was selected, who acted under the advice of Oliver and his attorney, and presented different statements, which were all inaccurate, unjust and erroneous, and were so indefinite and uncertain that the plaintiffs did not understand the same, and were imposed upon and deceived thereby; that Oliver demanded that plaintiffs should pay him $50,000 for his partnership interest in the business, which demand was accompanied by a threat that, if the same was not paid, immediate application would be made to the

court for the appointment of a receiver; that as a part of the assets of the business the firm owned and held a majority of the stock of the First National Bank of Platts-mouth, and that plaintiffs believed that if a receiver was appointed for the business it would produce a run upon the bank, which would ruin both the banking and the mercantile business, and bring disaster to the depositors; that plaintiffs were placed in great mental distress and agony by the threat, were deprived of their free will and judgment, and in order to prevent the appointment of a receiver they, solely by reason of the duress, paid Oliver $7,500 in cash, and gave him their notes and other assets, amounting in all to $50,000.

The answer alleged that after the death of E. G. Dovey the assets were taken over by a new firm composed of Oliver, George and Horatio as equal partners; that, in addition to one-half interest in the firm, E. G. Dovey left about $50,000 worth of other property which was taken over by the partnership and treated as personal property. Positive denial is made that the selection of the accountant was made by Oliver or his attorney; that he was partial or unfair; or that any threats were made or duress suffered. It was also alleged that Oliver's interest which he offered to sell for $50,000 was conceded to be worth $52,276.76, when taking good-will into account, and that this offer was a fair compromise of the firm affairs; that Oliver had determined, on failure of an amicable adjustment, to bring suit for dissolution and receivership, and so told plaintiffs, but this was not intended or understood as a threat, but as a matter of prudence and good judgment, and that the settlement was reached by the plaintiffs after a thorough investigation and conference with their attorneys; that plaintiffs took possession of the business on December 22, 1909, and have been in control thereof ever since; that defendant has incurred other obligations and liabilities on the assumption that the notes would be paid, and that plaintiffs have been guilty of laches, and are now estopped from disputing the validity of the settlement.

On the trial, after both parties had rested, the court rendered a tentative or interlocutory opinion, finding that the evidence showed that an agreement was made about July 22, 1885, between the parties that they should become equal partners in the business; that Mrs. Dovey was at no time regarded as a partner in the firm, but that the money and property which went into the business belonged to her as an interest-bearing loan; that the peculiar situation with respect to the bank placed plaintiffs' minds in such a condition that the threatened appointment of a receiver amounted to duress, in order to be relieved from which they executed the settlement. Having found that the partnership was actually formed in 1885, and not in 1881 as alleged, the court gave the parties leave to amend their pleadings to correspond with the facts. Plaintiffs asked, and were given, leave to file an amended reply setting forth the assets as they claimed them to be on July 22, 1885. Additional evidence was taken with respect to the condition of the books and the assets, and at the conclusion of the testimony the district court handed down a further opinion, in which he held substantially that it was the duty of plaintiffs to put the bank and the depositors out of the reach of danger which might arise from the affairs of E. G. Dovey & Son, and that a rescission would have the effect to place defendant as he was before the transaction took place, and the plaintiffs would find themselves in the same predicament as to the bank, with the same right on the part of Oliver to proceed. Plaintiffs were also held to be estopped from opening up the transaction, and the action was dismissed for want of equity.

While the pleadings are based upon the idea that the firm was dissolved upon the death of E. G. Dovey, the evidence is clear that what actually took place was that the business was carried on in the same manner as before until July, 1885. At the time that E. G. Dovey died, Oliver was about 20 years old, and had been working in the store several years, and Horatio was about 17 years of age. He had been attending school at Nebraska City, had come home, and a short time afterwards in 1881, or early in 1882, he

went into the First National Bank as a clerk. At that time the firm had only a few shares in the bank, which was practically owned and controlled by other parties. Horatio continued to work in the bank as a clerk until about the time he became of age, which seems to have been early in 1885. According to the testimony of Oliver and Horatio, in July, 1885, Horatio was dissatisfied and was about to go away, and it was then agreed between the three brothers that, if Horatio would not leave, but would take part in the business, the three brothers should become equal partners. Oliver surrendered or gave up his claim to the portion of his salary as a clerk, not withdrawn by him, which at that time would, as he testified, amount to about $3,200. This agreement is denied by George, but the circumstances surrounding the transaction seem to establish the story told by Oliver and Horatio.

It appears that from the date of E. G. Dovey's death until 1885 the business was conducted by George and Oliver, and, as far as the evidence shows, it was carried on identically as before, except for the lack of the father's services. Plaintiffs contend that George's five-eighths interest in the business became profit-sharing *pro rata* on the death of E. G. Dovey, and we are of the same opinion. They also contend that this continued until the settlement of 1909, while we take the view that, under the contract or agreement of 1885, the profits were thereafter to be equally divided by the three brothers; that, while George owned an excess of capital, Oliver and Horatio contributed the services of two men against his; and that the withdrawal of one-fourth of the capital then in the business, and the payment of one-half of the amount due upon the stock account which these brothers would be entitled to demand and receive had they insisted on withdrawing their capital, would probably have dealt such a blow to the business that George would have been left seriously crippled. Can it therefore be said that his offer to divide the profits equally was not dictated by sound business judgment? The half interest of George, then, was profit-sharing, so also was the half interest belonging to the estate. Oliver testified

that he was receiving a salary of $50 a month (George says $40 or $50) before his father's death. When the new arrangement was made it would seem his salary ceased, and no charge was made for his services thereafter. The testimony shows that Mrs. Dovey's capital was treated as an interest-bearing investment from that time on, and, since no one is objecting, it will be so considered. A peculiar feature of the firm's transactions was that before the death of E. G. Dovey the proceeds of the sale of real and personal property which he owned, aside from his interest in the business, was paid into the firm and used by it in its business. It further appears that an account was kept, called the "stock account," in which all such sums were credited. At the time of Mr. Dovey's death, in 1881, there was a credit of $27,979.19 in that account. In one part of his testimony George claimed that about $10,000 of this account belonged to him. But he afterwards testified that the whole stock account belonged to the firm and was so credited, one-fourth to each of the heirs of his father's estate. This $27,979.19 was therefore a debt owing by the partnership to the estate of which George was the administrator. But it is not shown that he ever accounted for any property received by him as administrator from the time of his father's death. Property of the estate, both real and personal, continued to be sold, and the proceeds placed in the stock account. It appears that two expert accountants have attempted to ascertain what the books of the firm show, and they have submitted six different statements, which are utterly confusing and irreconcilable; and in the estimates following exact accuracy is not sought for, but the figures are taken from data made by George, or under his direction, before any controversy arose between the members of the firm.

It appears that in 1885, when the new arrangement was made, the assets of the firm, were $241,667.02, with liabilities amounting to $89,728.63. This left a net balance of $151,938.39, which was the amount of capital then invested in the concern, and of this capital the estate had a credit of $61,042.48; while the remainder of the capital, less the

original amount contributed by Oliver, belonged to George. From 1885 to the time of the settlement in 1909 the firm was very prosperous. It made large profits, and from those profits George had withdrawn $119,271.35, Horatio had withdrawn $76,859.88, while Oliver had only withdrawn $63,419.96. Each of the brothers had invested in a home and paid for the same out of the proceeds of the business. George had so invested $10,463.14, Horatio $6,076, and Oliver had invested $7,471.64. These amounts, added to the other withdrawals of the members of the firm, left the withdrawal account as follows: George $129,734.49, Horatio $82,935.88, and Oliver $70,891.60. It thus appears that George had benefited by withdrawals of all kinds, including the payment for his house, to the amount of $58,842.89 more than his brother Oliver; and the only way in which George ever accounted to his brothers for the assets, of all kinds that came into his hands, of the estate of their deceased father was to turn them over to the partnership for the use in the business from 1881 to 1909, without allowing any interest on the amounts or any share in the profits at the end of the period. By his own act, without the request or agreement of his brother, George assumed to dispose of all of that interest by crediting his mother and brothers each a one-fourth interest of that accumulation. If the business grew from 1881 to 1885, and from 1885 to 1909, a large part of its growth was due to the fact that its assets were augmented by the proceeds of the estate of E. G. Dovey. It will not do to say that the three brothers and their mother were making withdrawals from the partnership, and that those withdrawals in time exceeded the amount of the assets in the hands of the firm belonging to the estate. It is George's claim that if he be allowed interest at 7 per cent. on the amount of his investment for 24 years, or if it is to be treated as profit-sharing to the extent of his entire five-eighths interest, in either case he has absorbed the entire business, leaving nothing to Oliver. He does not explain in these statements that his method of accounting would produce the same fatal result as to his brother Horatio, would like-

wise extinguish his interest, and make George the exclusive and sole owner of all of the assets as they existed on September 22, 1909.

We think it fairly appears that on the death of E. G. Dovey in July, 1881, the firm of E. G. Dovey & Son was thereby dissolved; that the control of the assets of the firm passed into the hands of the surviving partner, whose sole duty would have been to wind up the business and pay over to a representative of the estate, for distribution among the distributees, the share belonging to E. G. Dovey in his lifetime. It appears, however, that this winding up process did not take place, but the business was in fact conducted for 37 years thereafter by the surviving partner and two of the heirs of the estate. The business must have been so conducted under a new partnership agreement made after the death of the former partner, either express between the parties, or implied by their actions. It follows that the three partners were to share equally in the profits and losses, and that neither the excess contribution of capital by the one, nor the greater contribution of skill or services by another, would justify any change in the rule of equal participation in profits and losses. The rule thus announced is supported by the following authorities: 30 Cyc. 451, note 63; Collier, Partnership, secs. 308-313; Lindley, Partnership, p. 857; *Paul v. Cullum,* 132 U. S. 539; *Jacobson v. McCullough,* 113 Minn. 332. Partners are not entitled to interest on their respective capital unless there is some agreement to that effect. Such an agreement may be inferred if they have been in the habit of charging such interest in their accounts; but, in the absence of any evidence on that question, they are not entitled to interest. Even when one partner has brought in his stipulated capital, and the other has not, the former will not be entitled to interest on the winding up of the partnership, if it has not been previously allowed and charged in the accounts of the firm; and, where a person has been paid for services by a share of the profits, interest on capital cannot be charged against him unless there is some agreement to that effect. Lindley, Partnership, p.

423. The same rule is laid down in 2 Bates, Partnership, sec. 781, and in the following cases: *Griggs v. Clark,* 23 Cal. 427; *Taylor v. Coffing,* 18 Ill. 422; *Whitcomb v. Converse,* 119 Mass. 38; *Caldwell v. Leiber,* 7 Paige Ch. (N. Y.) 483; *Ratzer v. Ratzer,* 28 N. J. Eq. 136. In the case last cited, it was said: "In the absence of any agreement as to the interests of the partners, a partnership is presumed to have been carried on for the joint interest of the partners, and each is entitled to an equal share of the profits with the others." In *Miller v. Hale,* 96 Mo. App. 427, it was said: "The law is that as between themselves, the contract of partnership being silent, partners are entitled to share equally in the compensation for their labor. The courts decline to look into the question of which performed the more onerous duties, and whether one was more skilful or more industrious than the other. An adjustment of that nature is not demanded by the nature of the contractual association and would often prove to be impractical." In *Robinson v. Simmons,* 146 Mass. 167, the following rule was announced: "As a general rule, where a surviving partner continues to use the capital of a deceased partner in the business, the representatives of the latter, in the absence of any agreement to the contrary, have the election to demand either interest on the capital used or the profits earned by its use, the latter being accretions to the fund owned by them. There is, however, no inflexible rule governing all cases, but each case depends upon its own circumstances and equities."

As we view the evidence, Oliver C. Dovey, at the time when the dissolution took place in 1909, had an interest in the firm amounting to at least $45,000, and, taking into consideration the good-will of the business which had been successfully conducted for more than 30 years, the consideration of $50,000 for his withdrawal from the firm cannot be said to be unjust or unreasonable.

Again, the plaintiffs have wholly failed to rescind or seek a rescission of the settlement of September 22, 1909, and have neglected and refused, and still neglect and refuse, to surrender or offer to surrender any part of the consider-

ation which they have received for the cash and notes given by them to Oliver in the settlement. Under such circumstances it is evident that the lower court found no serious difficulty in applying to this case the well-known rule of law that before a party dissatisfied with a transaction on account of alleged fraud or duress can institute a proceeding to rescind his contract, he must promptly disclaim the benefits of the transaction whenever he discovers the fraud, or when duress has been withdrawn. He must abide by that attitude throughout, and refuse to take any benefit from the consideration moving to him, and a failure to do so bars him from the equitable remedy of rescission.

The evidence in this case shows that, at the time the plaintiff Horatio Dovey signed the notes, he believed Oliver to be a one-third partner in the business, and he knew that Oliver's interests must be the same as his own, except as they might have differed in their withdrawals, and Horatio's withdrawals were the greater. In the negotiations relating to the settlement, he made no claim of any different status. As a result of the settlement Horatio became the owner of four-tenths of the assets of the partnership, and he admitted frankly on the witness-stand that if he does not pay the notes in question he will be getting that four-tenths for nothing. George Dovey claims that Oliver had no interest in the business at the time of the settlement; that he never had more than one-eighth of an interest in the business, and never had acquired any more, and never was a third partner in the profits. The evidence also shows that at the moment George Dovey signed the notes in question he intended to repudiate them, and also intended to keep the profits of the transaction. It is well settled that in case of fraud the plaintiff, on the discovery of it, must move promptly, and any unreasonable delay in declaring a rescission, any equivocal attitude, any use or enjoyment of the fruits of the contract, settlement or deed which he challenges, would bar his right of action. *Gallagher v. O'Neill*, 78 Neb. 671; *American Building & Loan Ass'n v.*

*Rainbolt,* 48 Neb. 434; *Building & Loan Ass'n v. Cameron,* 48 Neb. 124; *Hawley v. Von Lanken,* 75 Neb. 597.

·In the case at bar we have seen that the plaintiffs received from Oliver Dovey the formal conveyance of a legal title of real estate, which legal title unquestionably rested in him by the statute of descent, and could only be taken from him without his consent by a formal suit for a dissolution of the firm, by a decree therein finding that upon a full settlement of the accounts of the partnership he was entitled to no interest therein, and that he was bound in equity to convey the property. Moreover, plaintiffs received a bill of sale transferring to them all the interest of Oliver Dovey in the partnership other than the real estate, consisting of a stock of merchandise and a large list of book accounts, and necessarily including an interest in the good-will of a profitable business firm which had been in existence in Plattsmouth for more than a third of a century. The plaintiffs retained these things, and not only do they retain and enjoy the property which they got for the notes in question but they also retain an equally valuable right which they never offered to restore to the defendant, to wit, his agreement for a dissolution of the partnership and a surrender of all interest therein, including his right to bring an action for a dissolution and an accounting. All these matters were taken into account by the trial court and considered by him when he rendered his decree dismissing the plaintiffs' action.

After a careful examination of the record, we are not convinced that the finding and judgment of the district court was wrong, and it is therefore

AFFIRMED.

REESE, C. J., not sitting.

SEDGWICK, J., dissenting.

When E. G. Dovey died intestate in 1881, he and his son George Dovey had been equal partners in business for something over five years. He left surviving him three sons, George, Horatio and Oliver Dovey, and his widow. After

his death his three sons continued the business until in the year 1909, when, a difference having arisen between them, Oliver claimed a one-third interest in the business. After some negotiations and consultations with attorneys, George and Horatio agreed with Oliver to give him $50,000 for his interest in the business, and executed their notes and securities in that amount accordingly. Afterwards George and Horatio brought this action in the district court for Douglas county to set aside the said agreement and cancel the notes and securities, on the ground that they were obtained by duress and fraud. Oliver had transferred these notes to other parties, and these other parties were also made defendants. Afterwards Oliver brought the notes and securities into court to abide the result of the litigation, and no further consideration was given to the assignees of these securities. There is therefore virtually one defendant, Oliver. The district court entered a decree in favor of the defendant and dismissed the plaintiffs' case, and the plaintiffs have appealed.

The record is a large one; the briefs are extensive, and present a variety of questions for solution. It is conceded that at the time of their father's decease the net value of the business was $52,092.42, and that George Dovey had been an equal partner of his father, and was at that time the owner of an undivided one-half interest in the business, of the value of $26,046.21. George was appointed and acted as administrator of his father's estate, and used the money that came to his hands as such administrator in the prosecution of the business, and no agreement was made between the three brothers nor any questions raised or suggested as to the rights of each in the business, or their relation thereto, or their liability arising therefrom, until some time during the year 1885 about four years after their father's death. It is also conceded that at the time these plaintiffs agreed to give the defendant $50,000 for his interest in the business the net value of the business was $142,796.56, and that in the meantime the three sons and their mother had withdrawn from the business $201,-353.33.

Dovey v. Dovey.

The most important points in dispute between these parties now are: First. Were the notes and mortgages in question procured by duress so that a court of equity should now disregard them as a just settlement between the parties? Second. Should George be allowed a share of the net profits in proportion to his share in the property after his father's death? Third. Were the three sons equal partners in the business so that each should be entitled to one-third of the net profits? Fourth. If they were equal partners and should share equally in the profits of the business, should George be allowed interest on his excess capital? Fifth. If George is allowed interest on his excess capital, should the partners each be charged with interest on their respective withdrawals? Some of these essential disputes are mentioned in the majority opinion.

1. As to whether the notes and securities were obtained by duress, so that a court of equity will disregard it as a just settlement between the parties, we should consider that a part of the assets of the business at the time of the agreement of settlement consisted in a majority of the capital stock in a bank in Plattsmouth, which was doing a prosperous business, and had over $350,000 deposits of more than 1,000 depositors, and these plaintiffs were the principal officers of the bank. The plaintiff had attempted to exclude the defendant from the business, and the defendant demanded an immediate settlement and payment of the interest which he claimed in the business. He, and his attorney for him, insisted upon a settlement without delay, and threatened an action for a dissolution of the partnership and division of the assets. So far there is no doubt that the defendant was strictly within his rights, but although the business was in a prosperous condition, and the net assets seem to have been ample to guarantee the defendant whatever amount a court of equity might decree to be due him, he insisted, not only upon his right of action for a dissolution of the partnership and a decree in his favor of the amount due him, but also insisted upon placing the assets and business in the hands of a receiver unless his demands were immediately complied with. It appears

that such action might, and probably would, have occasioned a loss to the business greater than the amount claimed by the defendant. The cash in the bank was $60,-000; deposits about $360,000. A run on the bank would be ruin to the business, and at least delay and loss to the depositors. For these reasons, and under the circumstances disclosed by the record, it seems certain that a court of equity should not regard this settlement as a voluntary and free act of the parties, dictated by their united best judgment of their respective rights.

The defendant contends that, by a delay of about one year after the settlement, the plaintiffs being in full control of the business, the plaintiffs have been guilty of laches, and are estopped to question the validity of the settlement, and by their conduct have affirmed the settlement; that plaintiffs have not rescinded the sale nor offered restitution, but have acquiesced in and affirmed the sale. Many authorities are cited by the parties, upon this and other questions involved in the settlement of the affairs of this partnership. It is not to be expected that an authority could be found presenting an exact parallel with the case at bar in all its details. I have not seen such an authority. Each case must be determined upon its own conditions. In this case the plaintiffs desired to exclude the defendant from the business, and he desired and had determined to withdraw. The only question between them was as to the amount, if anything, the defendant was entitled to receive, and they all agreed that the amount was to be determined upon the basis of the value of the actual tangible assets of the business. The defendant was out of the business by the agreement of all parties interested, and an offer to receive him back into the business would have been idle and impracticable. The conveyances which the defendant had made were of small importance as compared with the main controversy, and the rights of all parties, as affected by such conveyances, could be fully protected by the final adjudication of the principal controversies, which would include all matters incidental thereto. No interest of the defendant could suffer or be in any way affected by the

delay in beginning the proceedings, and that delay does not appear to be unreasonable under the circumstances disclosed by the evidence. I think the court should, upon view of the whole transaction, adjust the equities of the parties to the end that the final decree may, so far as possible, do exact justice.

2.   Plaintiffs contend that the excess capital of George E. Dovey, $26,046.22, and Mrs. Dovey's capital, should be profit-sharing, thus entitling George to five-eights of the profits of the business. The profits, however, were produced by the capital and the personal services which the partners contributed to the business. It is impossible to ascertain what proportion of the profits arose from the use of the capital, unless we can ascertain the relative value of the services of the respective partners. This it is impossible to determine from this record, and therefore there is no basis upon which the profits arising from the capital can be determined. I have no doubt that these three brothers, under the circumstances in this case, should be regarded as equal partners in the profits and losses of this business from the time of the decease of their father. It is a fundamental principle of the law of partnership that, unless otherwise expressly agreed, the partners shall share equally in profits and losses, and when these brothers undertook to conduct this business together, each having a financial interest therein after their father's death, and each giving his personal attention to the business without any agreements as to profits and losses, the law will undoubtedly regard them as equal in that respect. Mrs. E. G. Dovey has apparently taken no part in the business, except that she has allowed the use of her capital, $6,511.55, and her one-fourth share of the various amounts derived from her husband's estate and used in this business, upon which she is entitled to simple interest at 7 per cent. per annum, deducting of course as partial payments such sums as she has received from the business. Amounts received by her from time to time should be applied, first, in payment of accrued interest due her, and the remainder, if any, applied to reduce the principal. If the credits to her

account and debits for withdrawals are so numerous and irregular as to make computation, as partial payments are usually made, so difficult as to be impracticable, the computation should be made for each business year as shown by the books, so that she is not charged with interest on the withdrawals unless and when those withdrawals exceed the interest due her on her capital used in the business.

3. Should George be allowed interest on the excess of his investment? This presents a question of more difficulty, and, in connection with the question of interest on the withdrawals from the business, contsitutes the principal difficulty in this case. There is no doubt that when men agree to form a partnership, and that each shall give his attention to the business, and that each shall furnish capital in specified unequal amounts, and their agreement contains no provision for interest on the capital so furnished it will be presumed that they have incorporated into their contract all of the points upon which they agreed, and from this presumption the law will imply that the services of the parties and other conditions which they had in mind were by their agreement offset against the use of the capital so furnished by each. In this case it cannot be found from this record that these parties made a contract of partnership in which the law would imply that they had inserted all of their agreements. For four years after the father's death the business was conducted by the three brothers without any agreement between them, or any suggestion of any necessity for an agreement, and then there was an informal talk, in which one of the brothers desired to withdraw from the business, and George requested him to remain, and, according to the preponderance of the evidence, it was stated by George that they would be partners in the business, and perhaps it was stated that the partnership should be an equal one. There was no attempt to formulate or agree upon any details of a partnership agreement, and no suggestions that George was under any obligations to continue his excess capital in the business. This conversation between the brothers amounted to nothing.

more than a confirmation of the pre-existing conditions, and there was of course no contract implying that George should allow his excess capital to remain for any length of time in the business. If George had agreed that while the partnership continued he would contribute $26,000 more than either of the other partners, and had not in that agreement stipulated for interest on this excess capital, the law would imply that no interest was to be paid, but under the circumstances in this case there is no ground for such an implication.

4. It is a universal rule of equity that when partners, who are equal as to profits and losses, withdraw from the business an unequal amount of the profits without any special agreement or objection on the part of any one, they will in final settlement be charged with the profits so withdrawn, but without interest thereon. I think, therefore, that the three brothers were equal partners in the profits and losses; that George Dovey should be allowed from the assets his excess contribution of the capital, $26,046.22, with simple interest thereon at 7 per cent. per annum from the death of his father to the 22d day of September, 1909. The share of Mrs. E. G. Dovey should, of course, be deducted from the net assets before the division between the three partners, and also the excess capital of George as above stated. The defendant Oliver was on that date entitled to one-third of the remaining assets, and was also entitled to one-third of the profits withdrawn by the three brothers. The total profits withdrawn by the three brothers, admitted in the pleadings, amounted to $197,319.03, of which Oliver withdrew $41,665.71. He was therefore entitled to $24,107.30, in addition to his one-third of the net assets at the time of the agreed dissolution of the partnership.

The third paragraph of the syllabus of the majority opinion seems to have no application to this case. All of the heirs continued the business together after their father's decease, and consented to the use in that business of all the money derived from the estate, and had equal advantage of such use.

95 Neb. 41

The majority opinion says that "George's five-eighths interest in the business became profit-sharing pro rata on the death of E. G. Dovey." If that is so, it seems impossible to reach the conclusion that Oliver, "at the time when the dissolution took place in 1909, had an interest in the firm amounting to at least $45,000," as is also stated in that opinion.

The majority opinion inquires, "Can it therefore be said that his (George's) offer to divide the profits equally was not dictated by sound business judgment?" George's "offer" was nothing more than a statement that they were equal partners from the time of their father's death, as above shown.

It is said in the opinion that "Partners are not entitled to interest on their respective capital unless there is some agreement to that effect." Several cases are cited, some of which hold that where a partner agrees to contribute excess capital, and does not stipulate for interest thereon, no interest will be allowed. But no case is cited holding that when there is no agreement to contribute excess capital, but merely an understanding that an equitable adjustment of the whole matter shall be made, and the business and capital are principally the property of one of the partners, no account shall be taken of such condition in adjusting the equities between them. As I have already stated, it is the agreement to furnish capital (presumably against the more valuable services of the other partners), without specifying in the agreement that interest shall be allowed on the capital so furnished, from which the law implies an agreement to furnish it without interest. George was familiar with the business, and had been active in the management thereof for several years before his father's death. It is conceded, and it might well be conceded, that George's services were worth much more to the business than Oliver's services were.

Upon the above computation it would be found that Oliver has received $15,000 or $20,000 more than he was entitled to, and a court of equity should adjust the whole matter accordingly.